TONKON TORP LLP
STEVEN M. WILKER, SBN 150946
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099
Telephone: (503) 802-2040
Facsimile: (503) 972-3740
Email: steven.wilker@tonkon.com

Attorneys for Defendant CanAm Pet Treats, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OCEAN SW, INC., and U.S. PET NUTRITION, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CANAM PET TREATS, INC., and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 3:14-cv-2059-BAS-KSC <br><br> **DECLARATION OF BRIAN CONNOLLY IN SUPPORT OF DEFENDANT CANAM PET TREATS, INC.'S MOTION TO TRANSFER OR DISMISS FOR LACK OF PERSONAL JURISDICTION** <br><br> Judge: Hon. Cynthia Bashant <br> Courtroom: 4B <br> Hearing Date: October 13, 2014 <br><br> **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

I, BRIAN CONNOLLY, hereby declare as follows:

1.      I am the Chief Executive Officer of CanAm Pet Treats, Inc. ("CanAm"), the defendant in the above-entitled action.  I make this declaration based on personal knowledge and, if called to testify, would attest to the facts stated herein.

2.      CanAm is a company organized and existing under the laws of British Columbia, Canada.  Its principal place of business and corporate offices are located in British Columbia.  It has a manufacturing facility in Milan, Missouri, which also houses its United States corporate offices.  CanAm manufactures and distributes pet treats that are sold throughout Canada and the United States.

3.      CanAm does not have any offices or facilities in California.  It does not have any employees in California.  None of CanAm's officers or directors resides in California.  CanAm's only connection to California is that it markets and sells products into California in the ordinary course of its business, just as it markets and sells throughout North America.

4.      Darford International, Inc. ("Darford") was a company existing and organized under the laws of British Columbia, Canada.  It was in the business of manufacturing and distributing pet treats throughout North America.  Plaintiffs Ocean SW and USPN were both investors in Darford.  USPN was also a distributor for Darford in the United States.

5.      Darford was experiencing financial difficulties and went into receivership.  The receivership occurred in British Columbia and was governed by the laws of British Columbia, with the receiver located in Vancouver, B.C.  CanAm is a Canadian company that was created to, and ultimately did, purchase certain of the assets of Darford as part of a liquidation plan approved by the court in British Columbia.

6.      As part of the Canadian receivership and in connection with its purchase of the Darford assets, CanAm (directly or through its wholly-owned subsidiary, Darford Holding Company, Inc.) entered into a series of related agreements with the plaintiffs: (1) a Distribution Agreement with USPN; (2) a Sub-Lease with USPN; and (3) a promissory note with Ocean SW.  These agreements were all part of an overall agreement between CanAm (as the Darford asset purchaser) and USPN/Ocean SW (as the former distributor for and investors in Darford).

7.      The Distribution Agreement between CanAm and USPN sets out the terms of a product distribution relationship between CanAm and USPN.  A copy of the Distribution Agreement is attached to this Declaration as Exhibit 1.  It specifically stated that the parties were entering into the agreement in part because CanAm agreed to recognize prior indebtedness owed to Ocean SW by Darford.  The parties agreed and understood that CanAm would be voluntary undertaking to repay a debt to Ocean SW that CanAm was not obligated to pay.  CanAm therefore executed a promissory

note in favor Ocean SW (the "Promissory Note"), which is the subject of this lawsuit. A copy of the Promissory Note is attached to this Declaration as Exhibit 2.  The Promissory Note states that it is governed by the laws of British Columbia, Canada

8.     The Distribution Agreement also set out specific obligations for USPN related to the Milan, Missouri facility that CanAm was going to sub-lease from USPN.  As contemplated by the Distribution Agreement, CanAm and USPN entered into a written sub-lease ("Sub-Lease") for the facility in Milan, Missouri.  A copy of the Sub-Lease is attached to this Declaration as Exhibit 3 and a copy of relevant portions of the Master Lease is attached as Exhibit 4.  Unfortunately, USPN failed to secure or provide terms in the Sub-Lease that were consistent with the terms that were promised in the Distribution Agreement.  Instead, the terms were much less favorable to CanAm.  Even worse, USPN defaulted under the terms of the Master Lease and CanAm was forced to negotiate with the landlord under the threat of eviction (after CanAm had already moved into and begun operations at the facility).

9.     Attached as Exhibit 5 is a letter from CanAm's Canadian counsel, Blair Rebane, to the plaintiffs, dated June 19, 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed on the 9th day of September, 2014.

_____
BRIAN CONNOLLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

## Exhibits to Declaration of Brian Connolly

Page(s)

Exhibit 1 – Distribution Agreement……………………………………..7-9

Exhibit 2 – Term Promissory Note……………………………………….10

Exhibit 3 – Sublease Agreement…………………………………11-14

Exhibit 4 – Lease………………………………………………………15-22

Exhibit 5 –Letter dated June 18, 2014…………………………………23-35

# Amended and Restated Agreement

1) This is an agreement (Agreement) between US Pet Nutrition (USPN) and Canam Pet Treats Inc. and its wholly owned subsidiary, Darford Holding Company, Inc. (together Canam).

2) USPN had entered into various written and oral agreements with Darford Industries Inc. (Darford). Canam acquired all the assets of Darford through the purchase of assets from the Receivership of Darford. Among the assets acquired were all the contractual rights of Darford, including specifically the prior agreements with USPN. While Canam did not assume the indebtedness of Darford, it is prepared to enter into this Agreement with USPN, and USPN is prepared to enter into this Agreement with Canam, to preserve a mutually valuable and standing arrangement that is of benefit to both USPN and Canam.

3) This Agreement shall recognize the prior agreements of the USPN and Darford and amends, restates, and supersedes those agreements. Therefore, Canam desires to acknowledge the prior agreements (to the extent set forth in the Agreement) and be bound as described in this Agreement.

4) Canam is entering into this Agreement for, among other reasons, the following: the advantageous distributorship arrangement with USPN for Darford branded product; the expertise of USPN in matters of low cost distribution, back office services, and development of unique proprietary products to be sold to Canam from USPN, and sublease of the Milan, Missouri facility (as described below).

5) USPN is entering into this Agreement for, among other reasons, the following: Canam's assistance in recovering amounts owed to USPN by a common customer, Phillips, Canam's agreement to recognize prior indebtedness owning to Ocean SW (a party who provided loans to Darford to preserve Darford's business relationship with USPN for the benefit of USPN's parent), benefit of remaining a distributor with anticipated increases in volume, Canam's unique product formulations, Canam's quality control methods for organic certification, use of certain of Canam's sales' force, access to Canam's customer base for the sale of complementary, but not competitive, products, access to Canam's contacts with unique raw material suppliers, reduction in USPN's lease cost (as a result of the sublease) for the Milan, Missouri facility, use of Canam's regulatory manager for, among other things, assistance with CFIA regulatory compliance, Canam's production of certain USPN products, use of certain of Canam's equipment under agreed circumstances, and Canam's baking expertise.

6) The parties acknowledge that the agreements with Darford arose prior to July 1, 2012 and some have been in place significantly longer.

Now therefore, the parties agree as follows:

1. USPN shall remain a distributor of Canam and be paid 7% of all gross revenues derived from the sale of Canam's products distributed by USPN. USPN shall pay for Canam finished goods when the goods are ready to ship from the Canam production facilities. USPN shall provide distribution, warehousing (East and West Coast locations), delivery, customer

EXHIBIT 1
Page 7

provide preventive maintenance.  The use described in the preceding sentence will occur only during times when Canam is not fully utilizing its equipment and at Canam's discretion.

7.  USPN shall provide employee lease services to Canam for such US based Canam employees as Canam shall designate.  These lease services will allow such employees to obtain US benefits.  Except as otherwise provided in this Agreement, USPN shall pass through all direct costs (without markup or additional costs) to Canam and shall deliver an invoice to Canam monthly reflecting such costs.

8.  This Agreement shall have an initial term of five years and may be extended by Canam for five additional five year increments, subject to the right of USPN to terminate as provided in this section.  Canam shall provide notice one year in advance of the expiry of any five year term of its intent to extend the term of this Agreement by another five years.  USPN shall have 30 days from any such notice to reject such extension, provided USPN shall pay at the option of Canam, either (i) all costs associated with relocating and recommissioning the production equipment in a location selected by Canam within the continental United States, including all upgrades, replacements, repairs, and additions used in the production at Milan, or (ii) the fair market value for the equipment based upon its in place and fully operational value (as determined by an appraiser reasonably selected by Canam).

Canam Pet Treats Inc                                          US Pet Nutrition


_____              _____

By:                                                          By:

Its:                                                         Its:

As of:                                                       As of:

EXHIBIT 1
Page 8

**From:** John Phelps <jphelps@uspetnutrition.com>
**Date:** Saturday, May 18, 2013 at 8:46 AM
**To:** BRIAN CONNOLLY <brian@darford.com>
**Subject:** FW: Emailing: Canam USpet agreement 001 (2)

See 3 of 4

**From:** Celina Phelps [mailto:celinatphelps@LIVE.com]
**Sent:** Thursday, May 16, 2013 5:05 PM
**To:** John Phelps
**Subject:** Emailing: Canam USpet agreement 001 (2)

# Emailing: Canam USpet agreement 001 (2)

VIEW SLIDE SHOW      DOWNLOAD ALL

This album has 1 photo and will be available on SkyDrive until 8/14/2013.

EXHIBIT 1
Page 9

## TERM PROMISSORY NOTE

**USD$1,050,000**                                                          **October___, 2012**
**Due on October ____, 2015 (the "Maturity Date")**

FOR VALUE RECEIVED, **CANAM PET TREATS INC.** (the "**Debtor**"), having a registered and records office at Suite 1200, 200 Burrard Street, Vancouver, British Columbia, V7X 1T2, promises to pay on the Maturity Date to **OCEAN SW, INC.** (the "**Lender**"), having an office at 9330 Scranton Road, Suite 500, San Diego, California, 92121 (or such other address as the Creditor may advise the Debtor in writing), the amount of ONE MILLION FIFTY THOUSAND DOLLARS (USD$1,050,000) in lawful money of the United States of America (the "**Principal Sum**"), together with interest accrued thereon from the date of this Term Promissory Note until all amounts owing by the Debtor to the Creditor under this Term Promissory Note have been paid in full. The Debtor hereby further covenants and agrees as follows:

1.          **Interest Rate.** Interest shall accrue on the outstanding Principal Sum at the prime rate, as posted from time to time by HSBC Bank Canada on its website, calculated and compounded monthly. Interest begins to accrue commencing on the date hereof, calculated on the basis of a 365 day year.

2.          **Payments.** Unless the Lender and the Debtor otherwise agree in writing prior to the Maturity Date, being the date which is 36 months from the date of this Term Promissory Note, the Debtor shall repay the Principal Sum and any accrued and unpaid interest before 2:00 p.m., pacific daylight time, on the Maturity Date.

3.          **Mandatory Payments.** If, following the payment of all current business and related expenses and obligations and after reserving an amount for future expenses and capital needs as determined by Debtor, the Debtor shall have sufficient cash-flow at the end of a calendar month to pay any amounts due hereunder, the Debtor shall make such prepayments as may be reasonably made in partial payment of the amounts due hereunder.

4.          **Prepayments.** The Debtor may prepay, at any time, the unpaid Principal Sum in whole or in part, without bonus or penalty.

5.          **Application of Payment.** Any payment made hereunder shall first be applied as payment of any accrued and unpaid interest owing by the Debtor, and the remainder thereof shall be applied as payment of the outstanding Principal Sum.

5.          **Applicable Law.** This Term Promissory Note shall be construed and enforceable under and in accordance with the laws of British Columbia and the laws of Canada applicable therein.

6.          **Enurement.** This Term Promissory Note is binding upon the Debtor and its successors and assigns and shall enure to the benefit of the Lender and its successors and assigns.

**CANAM PET TREATS INC.**

By: _____
                Authorized Signatory

VAN01: 3096510: v4

EXHIBIT 2
Page 10

SUBLEASE AGREEMENT

This is an Agreement between US Pet Nutrition, Inc., 189 N. Commerce Drive, Lyons, GA 30436 ("Tenant"), Darford Holding Company, Inc. 100-1150 Kalamalka Lake Road, Vernon, BC  V1T 6V2 CANADA ("Subtenant") and Milan Processing, a Division of Pet Poultry Products, Inc., 832 East 3rd Street, Milan, MO 63556 ("Landlord").

WHEREAS Tenant and Landlord have executed a lease agreement dated December 20, 2011 ("Master lease").

WHEREAS Subtenant wishes to sublease a portion of the premises covered under the Master Lease from Tenant.

THEREFORE, the parties hereto agree as follows:

Subtenant agrees to sublease the premises covered under the Master Lease from April 1, 2013 to the expiration of the Term of the Master Lease, including any renewals thereof. Subtenant agrees to comply with all Tenant terms contained in the Master Lease, which are incorporated herein by reference, except as expressly set forth below:

- Subtenant shall pay Fixed Monthly Rent of Four Thousand and 00/100 Dollars ($4,000.00) each month during the Term of this sublease except that Fixed Monthly Rent will be abated for the first six (6) months of the term of this sublease.  The Fixed Monthly Rent shall be paid directly to Landlord. Notwithstanding any provision of the Master Lease to the contrary, Subtenant will not be required to pay any other charge or fee on account of this sublease including, without limitation, those charges and fees set forth in Sections 4, 6, 7, and 13 of the Master Lease.

- Landlord acknowledges that the existing Tenant and Subtenant alterations are authorized.

- Subtenant will only be liable to Tenant and not to Landlord for breach of any Subtenant obligations under the Master Lease.

- Notwithstanding anything in the Master Lease to the contrary, Subtenant will only be liable to Tenant for any actions taken by it and not for the actions or inactions of Tenant or any third party.

- Subtenant is entitled to terminate this sublease at any time at its sole discretion upon not less than thirty (30) days prior written notice to Tenant and Landlord. Upon expiration or earlier termination of this sublease, Subtenant will have no further obligations hereunder.  To the maximum extent permitted by the terms of the Master Lease, Subtenant will be entitled to remove any and all of its fixtures

EXHIBIT 3
Page 11

and equipment, even if such are considered fixtures under applicable law, provided Tenant repairs any damage to the Premises caused by removal of such fixtures and equipment.

- Landlord shall give Subtenant notice of any default of Tenant and Subtenant may at it sole discretion cure such default within 30 days of such notice. Provided Subtenant is not in default hereunder, Landlord shall not evict Subtenant from, or dispossess Subtenant of, the premises until expiration of such 30 day period. Nothing contained herein shall excuse Tenant's default and Subtenant will be subrogated to the rights of Landlord under the Master Lease.

- Landlord shall provide 30 days' notice of the failure of Tenant to timely exercise the option under Section 30. Subtenant may in its sole discretion exercise such option during the 30 day period. In the event Subtenant agrees to exercise the option, Subtenant shall assume all terms of the Master Lease and shall become the tenant under the Master Lease and Tenant will have no further obligations under the Master Lease for any future obligations and Subtenant will have no obligation under the Master Lease to Landlord for any preexisting obligations of Tenant.

- Subtenant will be entitled to all those services and utilities which Landlord is required to provide under the terms of the Master Lease.

- The following specific provisions of the Master Lease will not apply to this sublease and will not be binding on Tenant and Subtenant as if they were the "Landlord" and "Tenant" under the Master Lease: Sections 1(b), 1(c), 1(d), 1(f), 1(g), 1(i), 3, 4, 6, 7, & 14.

- If Landlord shall default in the performance of any of its obligations under the Master Lease pertaining to the premises, Subtenant will have the right, upon prior notice to Tenant, and in the name of Tenant, to make any demand or institute any action or proceeding, in accordance with and not contrary to any provision of the Master Lease, against Landlord under the Master Lease for the enforcement of Landlord's obligations thereunder.

Tenant agrees that nothing in this sublease constitutes a release from any of the Tenant obligations under the Master Lease with the exception of their monthly rent being reduced from $20,879.00 to $16,879.00 a month. If Subtenant moves out before the end of the Master Lease, Tenant agrees to revert to the $20,879.00 a month rate.

**[signatures on following page]**

EXHIBIT 3
Page 12

IN WITNESS WHEREOF, the parties have executed this Agreement this 1st day of
April, 2013.

Subtenant:      Darford Holding Company, Inc..
100-1150 Kalamalka Lake Road
Vernon, BC  V1T 6V2
CANADA

By: _____
Brian Connolly, its _____

Tenant:      US Pet Nutrition, Inc.
189 N. Commerce Drive
Lyons, GA   30426

By:_____
John Phelps, its _____

Landlord:      Pet Poultry Products, Inc.
832 East 3rd Street
Milan, MO   63556

By: _____
Mark Hunsberger, its _____

89040-0001/LEGAL26684745.2

EXHIBIT 3
Page 13

IN WITNESS WHEREOF, the parties have executed this Agreement this 1st day of April, 2013.

Subtenant:        Darford Holding Company, Inc..
100-1150 Kalamalka Lake Road
Vernon, BC  V1T 6V2
CANADA

By: _____
Brian Connolly, its _____

Tenant:        US Pet Nutrition, Inc.
189 N. Commerce Drive
Lyons, GA  30426

By: _____
John Phelps, its _____

Landlord:      Pet Poultry Products, Inc.
832 East 3rd Street
Milan, MO  63556

By: _____
Mark Hunsberger, its _____

89040-0001/LEGAL26684745.2

EXHIBIT 3
Page 14

# LEASE

**Milan Processing
A Division of Pet Poultry Products, Inc.**

**And**

**US Pet Nutrition, Inc.**

**PREMISES:**

**832 East 3rd Street
Milan
Sullivan County
Missouri 63556**

EXHIBIT 4
Page 15

# TABLE OF CONTENTS

Section 1.  SUMMARY OF DEFINED TERMS .......................................................................... 1

Section 2.  PREMISES ................................................................. 3

Section 3.  TERM ......................................................................... 3

Section 4.  CONSTRUCTION BY LANDLORD ................................................. 3

Section 5.  SECURITY DEPOSIT ................................................................ 3

Section 6.  ADDITIONAL EXPENSES ........................................................... 3

Section 7.  PROPERTY TAXES .................................................................... 4

Section 8. ENVIRONMENTAL MATTERS ...................................................... 4

Section 9. TENANT'S ALTERATIONS ........................................................... 5

Section 10. CONSTRUCTION LIENS ............................................................. 5

Section 11. ASSIGNMENT AND SUBLETTING .............................................. 5

Section 12. LANDLORD'S RIGHTS OF ENTRY ............................................. 6

Section 13. REPAIRS AND MAINTENANCE .................................................. 6

Section 14. INSURANCE; SUBROGATION RIGHTS ...................................... 7

Section 15. INDEMNIFICATION .................................................................... 8

Section 16. QUIET ENJOYMENT .................................................................. 8

Section 17. FIRE DAMAGE .......................................................................... 8

Section 18. SUBORDINATION; RIGHTS OF MORTGAGEE ........................... 9

Section 19. CONDEMNATION ...................................................................... 10

Section 20. ESTOPPELS CERTIFICATE ...................................................... 11

Section 21. DEFAULT .................................................................................. 12

Section 22. CURING TENANT'S DEFAULT .................................................. 15

Section 23. LANDLORD'S REPRESENTATION AND WARRANTIES ............. 16

Section 24. SURRENDER ............................................................................. 16

EXHIBIT 4
Page 16

Section 25. GOVERNMENTAL REGULATIONS ................................................................ 16

Section 26. NOTICES ................................................................................................... 17

Section 27. BROKERS .................................................................................................. 17

Section 28. AUTHORITY .............................................................................................. 17

Section 29. NO OFFER ................................................................................................. 18

Section 30. RENEWAL OPTION ..................................................................................... 18

Section 31. MISCELLANEOUS PROVISIONS .................................................................. 18

Section 32. WAIVER OF TRIAL BY JURY ...................................................................... 20

Section 33. CONSENT TO JURISDICTION AND VENUE .................................................. 20

Section 34. HEIRS AND ASSIGNEES ............................................................................. 20

EXHIBIT 4
Page 17

# AGREEMENT OF LEASE

THIS AGREEMENT OF LEASE (this "Lease") is made as of this 20th day of December, 2012 by and between MILAN PROCESSING, a Division of Pet Poultry Products, Inc., authorized to do business in the state of Missouri, with an address of 832 East 3rd Street, Milan, MO 63556 (the "Lessor" and or "Landlord") and US PET NUTRITION, INC., with a place of business located at 189 N. Commerce Drive, Lyons, GA 30436, (the "Lessee" and or "Tenant").

## WITNESSETH:

WHEREAS, Lessor is the fee simple owner of certain real property known as 832 East 3rd Street, Milan, Sullivan County, Missouri (the "Real Property"); and WHEREAS, the Real Property is improved with, inter alia, a 142,000 (plus or minus) square foot industrial building (the "Building"); and

WHEREAS, the Lessor desires to lease to the Lessee a portion of the Building, as designated on schedule A attached hereto and made a part hereof (the "Premises"), upon the terms and conditions hereinafter contained; and

WHEREAS, the Lessee desires to lease the Premises from the Lessor, all upon the terms and provisions hereinafter contained.

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) to each in hand paid, the receipt of which is hereby acknowledged, and the mutual covenants, promises and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged between the parties, the Lessor and Lessee, intending to be legally bound, hereby agree as follows:

1.     SUMMARY OF DEFINED TERMS .

The parties agree that the following defined terms, as used in this Lease, shall have the meanings and shall be construed as set forth below:

(a) "Building": The 142,000 (plus or minus) square foot Building located at 832 East 3rd Street, Milan, Sullivan County, Missouri.

(b) "Premises": The 36,000 square foot @ $5.00/square foot portion of the Building. Additional  space can be leased in the future at the same rate.

(c) "Term": From the Commencement Date for a period of six (6) years, subject to Section 37 of this Lease.

EXHIBIT 4
Page 18

(d) "Fixed Rent":

| LEASE YEAR | FIXED ANNUAL RENT | FIXED MONTHLY RENT |
|---|---|---|
| January 1, 2012 through December 31, 2012 | 0.00 | |
| January 1, 2013 through December 31, 2017 | 180,000.00 | $15,000.00 |

(e) "Security Deposit": NONE.

(f) "Occupancy Date": January 1, 2012.

(g) "Rentable Area": The Premises.

(h) "Permitted Uses": Tenant's use of the Premises shall be limited to: an industrial use wherein a manufacturing facility, relating to the preparation, pasteurizing, packaging, chilling and distribution of pet food products will be operated or similar uses so long as such other similar uses pose no greater risk to the Premises, the Building, and/or the Lessor (all as reasonably determined by the Lessor) with respect to fire, casualty risk or potential for environmental contamination, and no other uses shall be conducted from the Premises. Tenant's rights to use the Premises shall be subject to all applicable laws and governmental rules and regulations, and to all reasonable requirements of the insurers of the Building.

(i) "Notice Address/Contact"

| | |
|---|---|
| Tenant: | US Pet Nutrition, Inc.<br>189 N. Commerce Drive<br>Lyons, GA   30426<br>Attn: John Phelps |
| Landlord: | Milan Processing Division<br>832 East 3rd Street<br>Milan, MO   63556<br>Attention: Norvel Lane |
| With copies to: | Pet Poultry Products, Inc.<br>PO Box 128<br>Bridgeville, DE 19933<br>Attention: Mark Hunsberger |

Page 2 of 21

EXHIBIT 4
Page 19

(j) "Rent": Fixed Rent and any other monetary obligations which Tenant has to Landlord under the terms of this Lease.

2.      PREMISES.

(a) Landlord does hereby lease, demise and let unto Tenant, and Tenant does hereby hire and lease from Landlord the Premises for the Term upon the provisions, conditions and limitations set forth herein.

3.      TERM.

The Term of this Lease shall commence (the "Commencement Date") on - January 1, 2012 and continue for six (6) years thereafter, subject to Section 37 of this Lease.

4.      CONSTRUCTION BY LANDLORD.

(a) Tenant acknowledges that, as of the date of signing this Lease, Landlord has agreed to make lighting improvements in good and workmanlike manner, and at Landlord's sole cost and expense.

(b) Landlord hereby agrees to make improvements to the leased production areas as outlined by tenant needs and recommendations. Changes: wall coverings, install doors to separate areas, seal walls and ceilings, remove water from production areas, remove refrigeration units, and repair ceiling penetrations. Seal drains, remove wall knockout, install wall separation, install wall separation for break room and bathrooms, and install doors. Landlord is making these changes at Tenants sole cost and expense to be paid for in (60) sixty monthly installments of $4,375.00.

5.      SECURITY DEPOSIT.

Landlord shall not require a security deposit from Tenant.

6.      ADDITIONAL EXPENSES WHICH SHALL BE THE OBLIGATION OF TENANT.

(a) Electric. Tenant shall be responsible for any and all of the electrical charges and costs relating to and associated with its use of the Premises. To the extent possible, separate electrical subpanels will be installed which will meter the extent of Tenant's use of electricity. Tenant shall reimburse Landlord directly for such electrical usage. If the electrical uses of Tenant cannot be separately metered, then Tenant shall reimburse Landlord, based upon Landlord's good faith and reasonable estimate of Tenant's electrical usage. These charges would be invoiced monthly along with rent and storage charges.

(b) Steam.  Tenant shall be responsible for all charges for steam relating to its use of the Premises.

EXHIBIT 4
Page 20

Rent be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other right or remedy provided for in this
lease, at law or in equity.

       (n) Interpretation -Both parties hereto acknowledge that each party has participated in the negotiation and preparation of this lease. Both parties shall be considered drafters of this Lease.

   32.    WAIVER OF TRIAL BY JURY

       LANDLORD AND TENANT WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS LEASE. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY TENANT, AND TENANT ACKNOWLEDGES THAT NEITHER LANDLORD NOR ANY PERSON ACTING ON BEHALF OF LANDLORD HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY TO MODIFY OR NULLIFY ITS EFFECT. TENANT FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS LEASE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. TENANT FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISIONS AND AS EVIDENCE OF SAME HAS EXECUTED THIS LEASE.

   33.    CONSENT TO JURISDICTION AND VENUE

       Tenant hereby consents to the exclusive jurisdiction of the state courts located in Sullivan County, and to the federal courts located in the Northern District of Missouri.

   34.    HEIRS AND ASSIGNEES

       All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, successors and assigns of said parties; and if there shall be more than one Lessee, they shall all be bound jointly and severally by the terms, covenants and agreements herein, and the word "Lessee" shall be deemed and taken to mean each every person or party mention as Lessee herein, be the same one or more; and if there shall be more than one Lessee, any notice required or permitted by the terms of this Lease may be given by or to anyone thereof, and shall have the same force and effect as if given by or to all thereof. The word "his" and "him" wherever stated herein, shall be refer to the "Lessor" or "Lessee" whether such Lessor or Lessee be singular or plural and irrespective of gender. No rights, however, shall inure to the benefit of any assigns of Lessee unless the assignment to such assignee has been approved by Lessor, in writing, as set forth in Section 15 of this Lease.

EXHIBIT 4
Page 21

IN WITNESS WHEREOF, the parties hereto have executed this Lease under seal the date and year indicated below.

ATTEST:

_Male L Stewart_
Secretary

LANDLORD:

MILAN PROCESSING DIVISION

By:

Name:

Title:

_Pres_

ATTEST:

Secretary

TENANT:

US PET NUTRITION, INC

By:

Page 21 of 21

EXHIBIT 4
Page 22

**Blair A. Rebane**
T  604.640.4130
F  604.622.5897
brebane@blg.com

Borden Ladner Gervais LLP
1200 Waterfront Centre
200 Burrard St, P.O. Box 48600
Vancouver, BC, Canada  V7X 1T2
T 604.687.5744
F 604.687.1415
blg.com



File No.  559023/000003

June 19, 2014

**WITHOUT PREJUDICE**

**Delivered by Courier**

Shue Wing Chan
c/o Ocean SW, Inc.
500 – 9330 Scranton Road
San Diego, CA  92121-7706

Paul English
USPET Nutrition, LLC.
500 – 9330 Scranton Road
San Diego, CA  92121-7706

Dear Sirs:

Re:   **Defaults under Amended and Restated Agreement (the "Distribution Agreement") between Canam Pet Treats Inc. ("Canam"), Darford Holding Company, Inc. ("Darford") and USPET Nutrition LLC ("USPN")**

We are legal counsel for Canam, who have provided us with a copy of the Distribution Agreement.

As you are aware, in or about 2012, Canam acquired all of the assets of Darford, including its contractual rights under a distribution agreement with USPN.  As part of Canam's arrangement to acquire the assets of Darford, Canam and USPN entered into the Distribution Agreement, whereby USPN agreed to provide distribution services to Canam, in addition and in continuance of the services that USPN had been providing to Darford.  Enclosed herein for your reference is a copy of the Distribution Agreement.

The Distribution Agreement contained a number of terms and conditions, including, but not limited to, the following:

(a)   USPN shall provide distribution, warehousing, delivery, sales, customer service and administrative support services (the "Distribution Services") to Canam for the purposes of selling and distributing Canam and Darford products to customers in the United States;

(b)   in exchange for the Distribution Services, USPN would be entitled to collect a fee in the amount of 7% of all gross revenues derived from the sale of Canam products to customers in the United States;

VAN01: 3277408: v5

EXHIBIT 5
Page 23



(c)    USPN shall reimburse Canam for the cost of employing one salesperson with responsibility for selling Canam products to customers in the United States (the "Reimbursement");

(d)    USPN and Canam shall provide assistance and expertise to one another for the purpose of developing innovative products (the "Development Services");

(e)    Canam and USPN shall enter into a written sublease agreement (the "Sublease"), whereby USPN will lease to Canam a portion of USPN's production facility in Milan, Missouri. The monthly rent payable by Canam under the Sublease shall be $4,000.00 per month, which amount shall be all-inclusive;

(f)    USPN shall provide employee lease services (the "Employee Lease Services") to Canam employees operating in the United States for the purpose of allowing such employees to obtain US benefits; and

(g)    the Distribution Agreement shall have an initial term of five years, and may be extended by Canam for five additional five year increments.

As you are also aware, in conjunction with the Distribution Agreement, Canam agreed to recognize and assume responsibility for certain loans previously made to Darford (the "Darford Debt") by Ocean SW, Inc. ("Ocean SW"). For this purpose, Canam granted to Ocean SW a promissory note in the amount of USD $1,050,000.00 (the "Promissory Note"). Canam's acquisition of Darford's assets, the assumption of the Darford Debt and the issuance of the Promissory Note were all conditional upon USPN and Canam entering into the Distribution Agreement and Ocean SW providing a loan to Canam in the amount of USD $500,000.00 (the "Loan"), which was intended to provide a source of backup financing for Canam and Darford, if required.

We have been advised by Canam that USPN has breached the terms of the Distribution Agreement in all of the following respects:

(a)    USPN has ceased providing the Distribution Services to Canam;

(b)    USPN has failed or refused to provide the Reimbursement to Canam;

(c)    USPN has failed or refused to provide the Development Services to Canam;

(d)    USPN has breached the terms of the Sublease by, among other things, failing to pay its share of the rent and utilities accounts for the production facility as required under its master lease with the landlord (the "Master Lease"); and

(e)    USPN has failed or refused to provide the Employee Lease Services for all Canam employees who are entitled to receive such services.

Such conduct by USPN is in fundamental breach of the express terms of the Distribution Agreement and the Sublease and constitutes a repudiation of the Distribution Agreement and the

- 2 -

EXHIBIT 5
Page 24



Sublease by USPN. We note that the defaults listed herein may not be exhaustive and Canam reserves the right to rely on any other defaults of USPN not detailed herein.

Canam has also informed us that Ocean SW has failed or refused to provide the Loan to them, as contemplated under the Promissory Note. As a result of this and USPN's repudiation of the Distribution Agreement, there is a complete lack of consideration for the Promissory Note. In the circumstances, Canam has no choice but to accept USPN's repudiation of the Distribution Agreement. Consequently, Canam has no obligations whatsoever under the Distribution Agreement or the Promissory Note.

Canam has suffered significant losses and damages as a result of USPN's breaches of the Distribution Agreement and the Sublease, and Ocean SW's failure to provide the Loan. In particular:

    (a)    Due to USPN's failure or refusal to provide the Distribution Services, Canam was forced to retain alternative third party service providers to market and distribute its products in the United States. This has resulted in significant additional ongoing costs and expenses for Canam in excess of USD $5,000 per month. Since the Distribution Agreement provided for a five-year term with five options to extend for five years each, and the options to extend were exercisable in Canam's sole discretion, Canam's position is that it has suffered losses and damages in excess of USD $1,800,000 as a result of USPN's breaches of the Distribution Agreement.

    (b)    Under the clear terms of the Sublease, Canam was obliged to pay fixed monthly rent in the amount of USD $4,000, including utilities. A copy of the Sublease is enclosed for your reference. Since USPN breached the Master Lease, Canam was forced to enter into a new lease agreement with the landlord, whereby it was obliged to pay more than twice the amount of rent payable under the Sublease and all of the utilities accounts for the production facility. This has resulted in significant additional ongoing costs and expenses for Canam in the amount of approximately USD $24,000 per month. Since the Sublease also provided for a five-year term with five options to extend for five years each, which were exercisable in Canam's sole discretion, Canam's position is that it has suffered losses and damages in excess of USD $8,500,000 as a result of USPN's breaches of the Sublease.

    (c)    As a result of Ocean SW's failure to provide the Loan, Canam was forced to find alternative sources of backup financing, all of which charge significantly higher rates of interest (in the range of 18% *per annum*). This too has resulted in significant ongoing costs and expenses for Canam, which continue to accumulate.

In light of the foregoing, Canam's position is that it has suffered losses and damages in excess of USD $10,000,000. Be advised that Canam is prepared to seek recovery of its losses through litigation, if necessary. That said, in the interest of resolving this matter expeditiously, and without causing any unnecessary costs or expenses for any party, Canam is prepared to accept the all-inclusive sum of USD $1,000,000, the return of the Promissory Note, and an acknowledgement in writing from Ocean SW that no amounts are owed to it under the Promissory Note, in full and final settlement of its claims regarding the Distribution Agreement,

- 3 -

VAN01: 3277408: v5

EXHIBIT 5
Page 25



the Sublease and the Loan.  Please note that this offer of settlement is subject to and conditional upon the parties entering into a mutually agreeable form of settlement agreement and release. This offer is open for acceptance by USPN and Ocean SW until 5:00 p.m. on Friday, June 27, 2014, at which time it will be automatically withdrawn without further notice.

Since we are legal counsel for Canam, we are not protecting your interests or providing any legal advice to you.  You should seek legal advice with respect to this matter.

Yours truly,
**Borden Ladner Gervais LLP**

by:

Blair A. Rebane
BAR/ecl

Encls.

- 4 -

EXHIBIT 5
Page 26

## Amended and Restated Agreement

1) This is an agreement (Agreement) between US Pet Nutrition (USPN) and Canam Pet Treats Inc. and its wholly owned subsidiary, Darford Holding Company, Inc. (together Canam).

2) USPN had entered into various written and oral agreements with Darford Industries Inc. (Darford). Canam acquired all the assets of Darford through the purchase of assets from the Receivership of Darford. Among the assets acquired were all the contractual rights of Darford, including specifically the prior agreements with USPN. While Canam did not assume the indebtedness of Darford, it is prepared to enter into this Agreement with USPN, and USPN is prepared to enter into this Agreement with Canam, to preserve a mutually valuable and standing arrangement that is of benefit to both USPN and Canam.

3) This Agreement shall recognize the prior agreements of the USPN and Darford and amends, restates, and supersedes those agreements. Therefore, Canam desires to acknowledge the prior agreements (to the extent set forth in the Agreement) and be bound as described in this Agreement.

4) Canam is entering into this Agreement for, among other reasons, the following: the advantageous distributorship arrangement with USPN for Darford branded product; the expertise of USPN in matters of low cost distribution, back office services, and development of unique proprietary products to be sold to Canam from USPN, and sublease of the Milan, Missouri facility (as described below).

5) USPN is entering into this Agreement for, among other reasons, the following: Canam's assistance in recovering amounts owed to USPN by a common customer, Phillips, Canam's agreement to recognize prior indebtedness owning to Ocean SW (a party who provided loans to Darford to preserve Darford's business relationship with USPN for the benefit of USPN's parent), benefit of remaining a distributor with anticipated increases in volume, Canam's unique product formulations, Canam's quality control methods for organic certification, use of certain of Canam's sales' force, access to Canam's customer base for the sale of complementary, but not competitive, products, access to Canam's contacts with unique raw material suppliers, reduction in USPN's lease cost (as a result of the sublease) for the Milan, Missouri facility, use of Canam's regulatory manager for, among other things, assistance with CFIA regulatory compliance, Canam's production of certain USPN products, use of certain of Canam's equipment under agreed circumstances, and Canam's baking expertise.

6) The parties acknowledge that the agreements with Darford arose prior to July 1, 2012 and some have been in place significantly longer.

Now therefore, the parties agree as follows:

1. USPN shall remain a distributor of Canam and be paid 7% of all gross revenues derived from the sale of Canam's products distributed by USPN. USPN shall pay for Canam finished goods when the goods are ready to ship from the Canam production facilities. USPN shall provide distribution, warehousing (East and West Coast locations), delivery, customer

EXHIBIT 5
Page 27

service, and back office services of the type that were provided to Darford. USPN shall provide LTL freight from the two distribution centers to customers identified by either USPN or Canam.  Such services are included in the distributorship fee set forth above.

2.  As part of the distributorship arrangement, USPN shall provide sales' support to Canam, including the referral of private label leads and assisting in selling Darford branded product. Canam shall provide sales leads to USPN from Canam's customers and third parties with whom Canam's sales force contacts for the sale of Canam's products.  To fulfill its sales' support obligation and in recognition of the joint benefit of Canam sales' force, USPN shall reimburse Canam for one sales person with responsibility for the United States.

3.  Canam shall provide reasonable access and use to its Regulatory Manager to provide assistance to USPN, including specifically regulatory compliance with the CFIA.  USPN shall reimburse Canam for 50% of the cost of such manager in recognition of this manager's time devoted and to be devoted on behalf of USPN.  At the request of USPN this manager shall devote approximately 50% of the manager's time on CFIA issues and such other regulatory issues that USPN shall identify (e.g., Shopper's, Wal-Mart, Dollarama).

4.  USPN and Canam shall jointly provide their assistance, expertise, and intellectual property to develop innovative products.  Canam shall be provided a royalty free license in perpetuity to produce, market, and sell any and all such products.  Examples of products and processes developed to date include "infusion" processes and the "Rockstar" product.

5.  Canam and USPN shall enter into a sublease agreement (the terms of the sublease agreement shall supersede any inconsistent terms contained herin).  The parties anticipate entering into such agreement in February, 2013 when USPN has reduced its use of the facility.  The leased space shall be that portion of the USPN leased space that Canam deems necessary for the operation of animal related product production.  The monthly cost of the sublease to Canam shall be $4,000 per month (subject to CPI-W increases at the end of every five years to be applicable to the next five years) and shall be all inclusive, including, without limitation, real property taxes, CAM charges, if any, utilities, and all other costs associated with the master lease.  The term of the sublease shall be the same term as this Agreement and shall be subject to the same rights of renewal and termination as set forth herein, provided however, Canam may terminate the sublease upon providing six months notice to USPN.  The first six months of the sublease shall be rent free in recognition of the time it will take Canam to be in full production and as an inducement by USPN to enter into the sublease.

6.  Canam shall be the operator of its Milan production operations, shall pay all production staff, and shall be responsible for all product that it produces at the facility and sells to third parties.  USPN shall be named as an additional insured on Canam's product liability policy, provided such additional cost is nominal.  Canam shall produce USPN baked or dry products at the request of USPN, subject to availability of the facilities after producing for Canam's requirements, and shall charge USPN reasonable co-packing overheads and a 7% markup.  In the event Canam desires to make its equipment available to USPN and USPN desires to use such equipment, USPN will at all times keep the equipment in good working order and

EXHIBIT 5
Page 28

provide preventive maintenance. The use described in the preceding sentence will occur only during times when Canam is not fully utilizing its equipment and at Canam's discretion.

7. USPN shall provide employee lease services to Canam for such US based Canam employees as Canam shall designate. These lease services will allow such employees to obtain US benefits. Except as otherwise provided in this Agreement, USPN shall pass through all direct costs (without markup or additional costs) to Canam and shall deliver an invoice to Canam monthly reflecting such costs.

8. This Agreement shall have an initial term of five years and may be extended by Canam for five additional five year increments, subject to the right of USPN to terminate as provided in this section. Canam shall provide notice one year in advance of the expiry of any five year term of its intent to extend the term of this Agreement by another five years. USPN shall have 30 days from any such notice to reject such extension, provided USPN shall pay at the option of Canam, either (i) all costs associated with relocating and recommissioning the production equipment in a location selected by Canam within the continental United States, including all upgrades, replacements, repairs, and additions used in the production at Milan, or (ii) the fair market value for the equipment based upon its in place and fully operational value (as determined by an appraiser reasonably selected by Canam).

Canam Pet Treats Inc                                      US Pet Nutrition


_____          _____

By:                                                       By:

Its:                                                      Its:

As of:                                                    As of:

EXHIBIT 5
Page 29

**From:** John Phelps <<u>jphelps@uspetnutrition.com</u>>
**Date:** Saturday, May 18, 2013 at 8:46 AM
**To:** BRIAN CONNOLLY <<u>brian@darford.com</u>>
**Subject:** FW: Emailing: Canam USpet agreement 001 (2)

See 3 of 4

**From:** Celina Phelps [<u>mailto:celinatphelps@LIVE.com</u>]
**Sent:** Thursday, May 16, 2013 5:05 PM
**To:** John Phelps
**Subject:** Emailing: Canam USpet agreement 001 (2)



# Emailing: Canam USpet agreement 001 (2)

VIEW SLIDE SHOW     DOWNLOAD ALL

This album has 1 photo and will be available on SkyDrive until 8/14/2013.

EXHIBIT 5
Page 30

## SUBLEASE AGREEMENT

This is an Agreement between US Pet Nutrition, Inc., 189 N. Commerce Drive, Lyons, GA 30436 ("Tenant"), Darford Holding Company, Inc. 100-1150 Kalamalka Lake Road, Vernon, BC  V1T 6V2 CANADA ("Subtenant") and Milan Processing, a Division of Pet Poultry Products, Inc., 832 East 3rd Street, Milan, MO 63556 ("Landlord").

WHEREAS Tenant and Landlord have executed a lease agreement dated December 20, 2011 ("Master lease").

WHEREAS Subtenant wishes to sublease a portion of the premises covered under the Master Lease from Tenant.

THEREFORE, the parties hereto agree as follows:

Subtenant agrees to sublease the premises covered under the Master Lease from April 1, 2013 to the expiration of the Term of the Master Lease, including any renewals thereof. Subtenant agrees to comply with all Tenant terms contained in the Master Lease, which are incorporated herein by reference, except as expressly set forth below:

- Subtenant shall pay Fixed Monthly Rent of Four Thousand and 00/100 Dollars ($4,000.00) each month during the Term of this sublease except that Fixed Monthly Rent will be abated for the first six (6) months of the term of this sublease.  The Fixed Monthly Rent shall be paid directly to Landlord. Notwithstanding any provision of the Master Lease to the contrary, Subtenant will not be required to pay any other charge or fee on account of this sublease including, without limitation, those charges and fees set forth in Sections 4, 6, 7, and 13 of the Master Lease.

- Landlord acknowledges that the existing Tenant and Subtenant alterations are authorized.

- Subtenant will only be liable to Tenant and not to Landlord for breach of any Subtenant obligations under the Master Lease.

- Notwithstanding anything in the Master Lease to the contrary, Subtenant will only be liable to Tenant for any actions taken by it and not for the actions or inactions of Tenant or any third party.

- Subtenant is entitled to terminate this sublease at any time at its sole discretion upon not less than thirty (30) days prior written notice to Tenant and Landlord. Upon expiration or earlier termination of this sublease, Subtenant will have no further obligations hereunder.  To the maximum extent permitted by the terms of the Master Lease, Subtenant will be entitled to remove any and all of its fixtures

89040-0001/LEGAL26684745.2

EXHIBIT 5
Page 31

and equipment, even if such are considered fixtures under applicable law, provided Tenant repairs any damage to the Premises caused by removal of such fixtures and equipment.

- Landlord shall give Subtenant notice of any default of Tenant and Subtenant may at it sole discretion cure such default within 30 days of such notice. Provided Subtenant is not in default hereunder, Landlord shall not evict Subtenant from, or dispossess Subtenant of, the premises until expiration of such 30 day period. Nothing contained herein shall excuse Tenant's default and Subtenant will be subrogated to the rights of Landlord under the Master Lease.

- Landlord shall provide 30 days' notice of the failure of Tenant to timely exercise the option under Section 30. Subtenant may in its sole discretion exercise such option during the 30 day period. In the event Subtenant agrees to exercise the option, Subtenant shall assume all terms of the Master Lease and shall become the tenant under the Master Lease and Tenant will have no further obligations under the Master Lease for any future obligations and Subtenant will have no obligation under the Master Lease to Landlord for any preexisting obligations of Tenant.

- Subtenant will be entitled to all those services and utilities which Landlord is required to provide under the terms of the Master Lease.

- The following specific provisions of the Master Lease will not apply to this sublease and will not be binding on Tenant and Subtenant as if they were the "Landlord" and "Tenant" under the Master Lease:  Sections 1(b), 1(c), 1(d), 1(f), 1(g), 1(i), 3, 4, 6, 7, & 14.

- If Landlord shall default in the performance of any of its obligations under the Master Lease pertaining to the premises, Subtenant will have the right, upon prior notice to Tenant, and in the name of Tenant, to make any demand or institute any action or proceeding, in accordance with and not contrary to any provision of the Master Lease, against Landlord under the Master Lease for the enforcement of Landlord's obligations thereunder.


Tenant agrees that nothing in this sublease constitutes a release from any of the Tenant obligations under the Master Lease with the exception of their monthly rent being reduced from $20,879.00 to $16,879.00 a month. If Subtenant moves out before the end of the Master Lease, Tenant agrees to revert to the $20,879.00 a month rate.

**[signatures on following page]**

89040-0001/LEGAL26684745.2

EXHIBIT 5
Page 32

IN WITNESS WHEREOF, the parties have executed this Agreement this 1st day of April, 2013.

Subtenant:         Darford Holding Company, Inc..
                   100-1150 Kalamalka Lake Road
                   Vernon, BC  V1T 6V2
                   CANADA

                   By: _____
                   Brian Connolly, its _____

Tenant:            US Pet Nutrition, Inc.
                   189 N. Commerce Drive
                   Lyons, GA   30426

                   By:_____
                   John Phelps, its _____

Landlord:          Pet Poultry Products, Inc.
                   832 East 3rd Street
                   Milan, MO   63556

                   By:_____
                   Mark Hunsberger, its _____

89040-0001/LEGAL26684745.2

EXHIBIT 5
Page 33

IN WITNESS WHEREOF, the parties have executed this Agreement this 1st day of April, 2013.

Subtenant:

Darford Holding Company, Inc..
100-1150 Kalamalka Lake Road
Vernon, BC  V1T 6V2
CANADA

By: _____
Brian Connolly, its _____

Tenant:

US Pet Nutrition, Inc.
189 N. Commerce Drive
Lyons, GA   30426

By:_____
John Phelps, its _____

Landlord:

Pet Poultry Products, Inc.
832 East 3rd Street
Milan, MO   63556

By: _____
Mark Hunsperger, its _____

89040-0001/LEGAL26684745.2

EXHIBIT 5
Page 34

IN WITNESS WHEREOF, the parties have executed this Agreement this _1st_ day of
_April_, 2013

Subtenant:       Darford Holding Company, Inc.
                 100-1150 Kalamalka Lake Road
                 Vernon, BC  V1T 6V2
                 CANADA

                 By
                 Brian Connolly, its

Tenant:          US Pet Nutrition, Inc
                 189 N. Commerce Drive
                 Lyons, GA  30426

                 By _John Phelps_  President
                 John Phelps, its

Landlord:        Pet Poultry Products, Inc.
                 832 East 3rd Street
                 Milan, MO  63556

                 By
                 Mark Hunsberger, its

EXHIBIT 5
Page 35

**CERTIFICATE OF SERVICE**

I, Steven M. Wilker, hereby certify that on this 9th day of September, 2014, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By:___*/s/ Steven M. Wilker*___
       Steven M. Wilker, SBN 150946

080000/02053/5861281v1